**FILED**

**07 C 7228**

**DECEMBER 26, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JUDGE ZAGEL
MAGISTRATE JUDGE BROWN

2007L012482
CALENDAR/ROOM U
TIME 00:00
Other Com Litigation

CALENDAR/ROOM U
TIME 00:00
Other Com Litigation

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| MARIAN BAUMANN, | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. |
| CHARLES LORD, | ) | |
| Defendant. | ) | **PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE** |

## COMPLAINT

Plaintiff, Marian Baumann ("Baumann"), by and through her undersigned counsel, alleges as follows:

### NATURE OF THE CASE

1.    This case arises out of defendant Charles Lord's termination and subsequent defamation of plaintiff Baumann.  Baumann was and for the past eleven years had been the only full-time employee of Commanderie D'Amerique de la Confrérie des Chevaliers du Tastevin, Inc., a Delaware nonstock corporation ("Commanderie"), working out of Commanderie's national office in Northfield, Illinois.

2.    As explained in detail below, shortly after he was installed as Commanderie's chief executive officer, Lord had Baumann terminated in furtherance of his secret plan to move Commanderie's national office from Northfield, Illinois, to the East Coast and thus closer to his New Jersey home.  Lord knew the Commanderie Members would never agree to relocating the national office at the expense of losing Baumann and the business continuity she imparted as Commanderie's only full-time employee for over the past decade.  Lord therefore hatched a scheme to coerce Baumann to quit, thereby severing Commanderie's principal tie to Northfield, Illinois.  With Baumann gone, Lord could then justify the move to the East Coast without political opposition.

**DEFENDANT'S EXHIBIT**

A

3.    However, all did not go to plan for Lord. Baumann did not quit. So, Lord had her fired – even though this was plainly against Commanderie's best interests, as Lord himself later admitted in a July 19, 2007 memorandum, a copy of which is attached hereto as <u>Exhibit A</u> ("July 19 Memorandum"). Put simply, Baumann was made a scapegoat by and for Lord in his personal quest to move Commanderie's national office closer to his New Jersey home.

4.    As Lord feared, the Members of Commanderie did not welcome the sudden and unexplained departure of the organization's long-time and respected employee, Baumann – let alone in furtherance of Lord's unilateral relocation of Commanderie's national office. Confronted with Member dissension resulting from Baumann's departure, Lord attempted to cover up his actions by lying to the Commanderie Members. In his July 19 Memorandum, which he prepared and sent to sixty-five senior Members of Commanderie, including some Members located in Illinois, Lord knowingly and falsely stated that Baumann had "resigned."

5.    But Lord went beyond lying in his July 19 Memorandum: he defamed Baumann in his July 19 Memorandum by falsely stating that "Ms. Baumann erased all the e-mails from our server." At best, this statement falsely accused Baumann of incompetence in her job performance. At worst, this statement accused Baumann of committing a crime under the Federal Computer Fraud and Abuse Act and the Illinois Computer Crime Prevention Law. Either way, this statement was defamatory *per se.*

6.    Expectedly, and as evidenced by correspondence sent by a Commanderie member immediately after Lord's defamatory July 19 correspondence, Baumann has been significantly and irreparably injured by Lord's libelous statements. Her personal and professional reputation has been incalculably damaged in front of the esteemed and prestigious Members of the Commanderie. In this action, therefore, Baumann seeks damages, including punitive damages, against Lord and Commanderie.

- 2 -

## THE PARTIES

7.      Plaintiff Baumann is a citizen of Illinois who resides at 816 Westwood Lane, Wilmette, Illinois.

8.      Defendant Lord is a citizen of New Jersey who resides at 101 Delview Lane, Delanco, New Jersey.   Lord currently serves as the Grand Pilier Général ("GPG") of Commanderie, a position that is equivalent to that of chief executive officer.

## BACKGROUND FACTS

### A.    Commanderie's Unique Organizational Purposes

9.      Commanderie's full corporate name, "Commanderie d' Amerique de la Confrérie des Chevaliers du Tastevin, Inc.," can be translated as the "American Assembly of the Brotherhood of the Knights of the Wine Tasting Cup, Inc." Commanderie is the United States chapter of the Confrérie des Chevaliers du Tastevin ("Confrérie France"), an organization formed in 1934 in Caveau Nuiton of Nuits-Saint-Georges, Burgundy, France, to promote knowledge and consumption of Burgundian wines.   For example, Confrérie France hosts numerous receptions celebrating the traditions, culture and wine of the Burgundy region at its headquarters in the Château du Clos de Vougeot, which was constructed in 1551 and includes a twelfth-century Cistercian cellar.

10.     Commanderie was formed in New York in 1939.   Like its parent organization, Confrérie France, Commanderie is an exclusive club, designed to cultivate friendship among members and promotion of the wines, traditions and culture of the Burgundy region. Membership in Commanderie is extremely selective: only elite diplomats, business persons and members of the legal profession are invited to become Commanderie Members.   As such, Commanderie presents a unique networking opportunity to its Members.

**B.    Commanderie Moves Its National Office To Illinois And Hires Baumann**

11.    On or about January 1, 1996, Commanderie moved its national office from Minneapolis, Minnesota, to Northfield, Illinois.  In relocating its national office to Illinois, Commanderie entered into a lease for office space at 2 Northfield Plaza, Suite 206, Northfield, Illinois.

12.    Shortly thereafter, on February 1, 1996, Commanderie hired Baumann as its sole, full-time employee.  At all times relevant to this Complaint, Baumann was the only employee of Commanderie, other than its corporate officers.  Further, at all times relevant to this Complaint, Baumann worked out of Commanderie's newly-opened Northfield, Illinois national office.

13.    In her capacity as Commanderie's only full-time employee, Baumann organized and facilitated all meetings of Commanderie's board of directors – the Grand Conseil – as well as its Members.  She also: (i) maintained Commanderie's business records, including but not limited to Membership dues; (ii) paid any bills, fees and taxes owed by Commanderie; and (iii) coordinated and transmitted almost all communications from Commanderie to its Members.

14.    Thus, in performing her responsibilities, Baumann had frequent and significant contacts with the esteemed and prestigious Members of Commanderie.

15.     Further, the demands entailed by her daily activities as Commanderie's only full-time employee required Baumann to extensively use computers and information technology.

16.    As Commanderie's only full-time employee, Baumann was responsible for almost all computers and information technology necessary to Commanderie's activities.  For example, Baumann assisted in the creation, input data into and maintained a Microsoft Access database in order to keep records about Commanderie and its Members, and to produce the annual Commanderie membership book, in both electronic and printed versions, which contained the names of Commanderie Members in all Commanderie local chapters in the United States and

Canada.    Additionally, Baumann used the QuickBooks software program to manage the Commanderie's finances and accounting records and generate invoices.

17.    Indeed, the only computer owned by Commanderie was the one used exclusively by Baumann at the Northfield, Illinois national office. By way of further illustration, Baumann utilized MS Excel to generate various reports describing the history of all Commanderie area presidents, what fees, costs and dues were charged by the various local chapters of Commanderie, and the wine cellar inventories of the local chapters of Commanderie.

18.    Baumann also sought and completed training to increase her computer skills and knowledge of relevant software applications. To this end, in 2001 Baumann enrolled in a class covering MS Excel. Previously, Baumann had taken classes in MS Word. Lord even admitted in his July 19 Memorandum that "Baumann received extensive training on the QuickBooks accounting software." (Exh. A, at 3.) Baumann was also instrumental in working with computer programmers hired by Commanderie to create a database customized to achieve Commanderie's unique organizational needs.

19.    As Commanderie's only full-time employee, Baumann worked frequently and closely with Commanderie's executive officers and, in particular, its GPGs. With the exception of Allan Bulley ("Bulley"), who served as GPG of Commanderie between 1999 and 2002, none of the GPGs during Baumann's tenure – John Sprague ("Sprague") (1996 through 1999), William Randall ("Randall") (2002 through 2004), Richard Finlay (2004 through May 2007) and Lord (May 2007 to present) – lived or worked in the Chicago metropolitan area. Yet, by communicating via telephone and e-mail, Baumann successfully met the needs of these distant GPGs while accomplishing her duties.

C.    **The May 2007 Annual Meeting Of Commanderie Members**

20.    The 2007 Annual Meeting of Commanderie Members was held on the weekend of May 5, 2007, in Toronto, Canada.  Ninety-two Commanderie Members attended the annual meeting.  As usual, Baumann coordinated much of the logistics and communications regarding the Annual Members' Meeting.

21.    At the Annual Members' Meeting, Lord was installed as GPG of Commanderie, for a term lasting three years.  Lord had served for the previous six years as a national officer of Commanderie, including for the immediately preceding three years as Grand Connétable, or Executive Vice-President.

22.    On May 5, 2007, the Members adjourned to the Canoe Club in downtown Toronto for lunch.  At this luncheon, Lord called Baumann to stand beside him at a podium in front of the ninety-two Commanderie Members in attendance.  Lord presented Baumann with a gold pin, in the form of a cluster of grape leaves, in honor of her eleven years of commendable service to Commanderie.  The assembled Commanderie Members then sang to her the "Ban Bourgogne" – Commanderie's highest salute – demonstrating their appreciation for Baumann's efforts.  Several Members approached Baumann in person after this presentation to congratulate and thank her.

D.    **Lord's Hidden Agenda and Resulting Dilemma**

23.    Having finally succeeded to the highest office in Commanderie, Lord had a simple goal: to move Commanderie's office away from Illinois to the East Coast and thus closer to his New Jersey home.

24.    Lord realized that, to reduce the any opposition from any of the Commanderie Members, he would need to minimize the factors that militated in favor of keeping the national office in Northfield, Illinois.  And the one critical factor for keeping the national office in Illinois

was Baumann – the sole full-time employee who was intimately familiar with the details of Commanderie's day-to-day operations and who was well-respected by Commanderie's Members.

25.    Lord was thus presented with a dilemma: he needed to get rid of Baumann in order to execute his pet project to relocate the national office to the East Coast, but politically, he could not be seen by the Members as having simply terminated Baumann for his own purposes. Therefore, he hatched a scheme to coerce Baumann into quitting, and when that did not work, he simply fired Baumann and then lied to the Members by claiming that Baumann had voluntarily resigned.

E.    **Lord Changes Commanderie Policy and Criticizes Baumann in an Effort to Coerce Baumann to Voluntarily Resign**

26.    Lord began executing his hidden agenda a mere two weeks after first becoming GPG. He started with a May 21, 2007 letter to Baumann, a copy of which is attached hereto as Exhibit B. While acknowledging the obvious – Baumann's expertise, his inexperience, and the Members' expectation that the national office would remain in Northfield, Illinois – Lord claimed that he preferred that Baumann be located closer to him:

> Because my predecessor had shown no inclination to prepare me for my administrative duties as GPG, or to familiarize me with day to day procedural routines, I had hoped you would become, in essence, my tutor about the way in which business had been conducted over your eleven years with the organization. Better than anyone else in [Commanderie], Marian, you are in a position to provide me the on the job-training that is absolutely essential if I am to faithfully and diligently discharge my duties as Chief Executive Officer.
>
> Were your office in the next cubicle or a few steps down the hall, I would have asked you into my office and offered you a cup of coffee so we could discuss such matters, or I would have knocked on your door and sat in font [sic] of your desk while we talked. But your desk is 800 miles away. That geographical remove makes it somewhat harder to form a close working relationship,

> but not impossible ... so long as there is goodwill on the part of
> both parties.

(Exh. B, at 1 (ellipses in original).)  Lord concluded that "for any number of reasons, I know we would all much prefer to leave the National Office just where it is and just as it is."  (*Id.*)  Unfortunately for Lord's plan, Baumann was not about to quit or move.

27.    Unaware of Lord's hidden agenda, Baumann continued to diligently perform her duties.  Having no choice, Lord continued to praise Baumann, as demonstrated by a May 24, 2007 e-mail, a copy of which is attached hereto as <u>Exhibit C</u>.  In that letter, Lord commended Baumann for her accurate forecast of the number of attendees to 2008 Annual Meeting of Commanderie Members, with Baumann's number being "bang in the middle." (Exh. C, at 1.)

### 1.    Glaser's Unprecedented Visit and Requests

28.    Despite these accolades, on the same day Lord sent his May 24 e-mail praising Baumann for her attendance forecast, Eugene Glaser ("Glaser"), the Grand Argentier, or Treasurer, of Commanderie, e-mailed to Bauman a list of items for Baumann to compile for Glaser's review.  A copy of Glaser's May 24 e-mail and the accompanying list are attached hereto as <u>Exhibit D</u>.  In this correspondence, Glaser:

- announced to Baumann that he intended to visit Commanderie's Northfield, Illinois national office on June 12 through 13, 2007 (Exh. D, at 1) – something that the national officers had done only a few times in the past eleven years (but not including Lord, who declined Baumann's invitation to visit the national office);

- noted that "[s]ince you [Baumann] have reconciled the QuickBooks going back to October, 2006 you should be able to provide that info to me directly for the period requested" (*Id.* at 1);

- requested the "CURRENT LEASE ON OUR OFFICE SPACE" (*Id.* at 2); and

- asked that Baumann "PLEASE MAKE AN [sic] SET OF KEYS TO THE OFFICE AND ANY CABINETS," explaining that this precaution was only in case of Baumann's untimely demise (*Id.* at 3).

29.    This unprecedented visit and accompanying requests were, in fact, in furtherance of Lord's plan to relocate the national office of Commanderie to the East Coast. To execute this move, Lord needed to determine how quickly he could terminate the lease for the Northfield, Illinois leasehold property. Further, Lord needed an extra set of keys to the Northfield, Illinois office in order to gain access to Commanderie's records and assets once Baumann had been coerced into leaving.

### 2.    Lord's Resurrection of the Previously Abandoned Expense Policy

30.    As a further part of his personal scheme to harass Baumann into quitting, on May 31, 2007, Lord sent an e-mail to Baumann, Glaser and Richard L. Sutton ("Sutton"), Commanderie's Grand Connétable, with an additional memorandum from Lord attached thereto. A copy of this correspondence and the accompanying memorandum from Lord are attached hereto as Exhibit E. The memorandum "detail[ed] a new policy, effective immediately, concerning purchases by the National Office with a value (cumulative purchase price) of $250. [sic] or more." (Exh. E, at 1.)

31.    Lord's "new" policy required the requesting party, for any purchase or allocation of funds of more than $250, to:

- complete a "Request for Purchase" memorandum;

- circulate that memorandum to the three most senior executives at Commanderie: Lord, Glaser and Sutton; and

- answer at least six questions, including identifying alternative suppliers and vendors and demonstrating that the best or competitive price has been obtained for the services or goods being purchased. (*Id.* at 2.)

32.    This new policy substantially hindered Baumann's ability to complete her tasks as Executive Director. Pursuant to Lord's directive, almost every purchase – from office supplies to stationery to the goods distributed as rewards for membership – would need to be researched,

described and analyzed in writing, and deliberated upon by a committee of Commanderie's three most senior corporate officers.

33.     These strict controls were instituted not to promote Commanderie's best interests, but to unfairly burden Baumann to coerce her into resigning voluntarily.

34.     In response to Lord's May 31 e-mail and memorandum, Baumann replied to Lord and explained that the new policy would increase her workload substantially. Baumann also advised Lord in a voicemail message why a similar expense policy that had been previously enacted by Commanderie failed and was ultimately abandoned.

**F.     Baumann Learns Of Lord's Plan To Move Commanderie's National Office To The East Coast**

35.     Even though she continued to ably perform her duties, Baumann became disturbed by the increasingly negative tenor of Lord's policies and comments as reflected in the foregoing exchanges. Therefore, with Lord out of the country on vacation, she asked other persons who were affiliated with Commanderie and with whom she was well acquainted whether something else was the cause of this recent strife.

36.     In particular, Baumann reached out to Allan Bulley, the former Commanderie GPG. Bulley had been on the two-person Commanderie team that initially hired Baumann in 1996, and Baumann had worked extensively with Bulley while he served as GPG.

37.     Bulley told Baumann in a telephone conversation on or about June 8, 2007, that Lord intended to make Baumann miserable in working for Commanderie so that she would resign voluntarily as Executive Director. Bulley also revealed that Lord's strategy to squeeze-out Baumann was actually part of Lord's larger aspiration to relocate the Commanderie national office to the East Coast.

38.     Baumann then quickly relayed this information to Louis-Marc Chevignard ("Chevignard"). Chevignard is Grand Connétable of Confrérie France, and as such acts as

Confrérie France's chief executive officer.    At the 2007 Annual Commanderie Members' meeting in Toronto, Chevignard had specifically asked Baumann to keep him apprised of events and developments at Commanderie.

39.    In an e-mail dated June 11, 2007, a copy of which is attached hereto as <u>Exhibit F</u>, Baumann informed Chevignard of Lord's plan to move the national office to the East Coast, and her anticipation that, because of the relocation, she would be forced to resign. (*See* Exh. F, at 1.) In his response later that day, which is attached hereto as <u>Exhibit G</u>, Chevignard opined: "I am discovering this and this is unexpected to me.... I am not very proud of this I would say." (Exh. G, at 1.)

40.    Baumann was now certain that Lord intended to move unilaterally the national office to the East Coast.  Further, Baumann realized that, despite her years of service, she was a mere pawn to be sacrificed in furtherance of Lord's personal relocation plan.

**G.    Glaser Visits The National Office In Northfield, Illinois, And Baumann Reveals That She Knows of Lord's Relocation Plan**

41.    On June 12, 2007, as foreshadowed in his May 24 e-mail, Glaser arrived at Commanderie's national office in Northfield, Illinois.  As previously noted, Commanderie national officers had visited Commanderie's national office only on a few occasions over the past eleven years.

42.    Upon arriving at the national office on June 12, Glaser asked Baumann why she had sent him a June 11, 2007 e-mail declining Glaser's invitation to have dinner with him on the evening of June 12.  In response, Baumann handed to Glaser a copy of the June 11 e-mail from Chevignard, explaining that she knew of Lord's intention to move the national office to the East Coast.    With this awkward moment having passed, Baumann and Glaser reviewed Commanderie's records for five hours that day, and over the course of the following day.

43.    On June 14, 2007, Sutton telephoned Baumann.  In that conversation, Sutton denied that the national office was moving, and asked Baumann from whom did she hear that Lord was planning to relocate Commanderie's national office to the East Coast.  Baumann told Sutton that she heard it from Chevignard.

44.    By this time, word of Lord's effort to move the national office away from Northfield, Illinois had leaked out to Commanderie's Members.  As Lord had always feared, the Members began to voice their resistance to any plan to move the national office to the East Coast without prior consideration and approval by the Members.  In particular, three former GPGs of Commanderie each communicated their opposition to any change in the location of the national office: Bulley, Sprague and Randall all spoke with Sutton and/or Lord to express their displeasure and dismay regarding Lord's relocation plan.

45.    On June 19, 2007, and contrary to Sutton's denial a mere five days earlier, Lord admitted in correspondence to Ingrid LaGrange Dupin ("Dupin"), a Confrérie France colleague of Chevignard, that he intended to move Commanderie's national office to the East Coast.  A copy of Lord's June 19 e-mail is attached hereto as Exhibit H.  In response to Dupin's inquiry of where to ship certain Commanderie products, Lord unequivocally stated: "It is true that we will be moving the National Office to the East Coast sometime this summer.  Exactly where the office will be located has not yet been determined." (Exh. H, at 1.)

46.    Thus, on June 27, 2007, Baumann prepared and sent an e-mail to sixty-five Members of Commanderie, a copy of which is attached hereto as Exhibit I.  The sixty-five recipients of the e-mail included forty presidents of various Commanderie chapters located throughout the United States.  In her e-mail, Baumann confirmed to the Commanderie Members that the national office was indeed being moved to the East Coast:

Grand Pilier General Charles Lord and Grand Connetable Richard Sutton have determined that it is in the best interest of the organization to relocate the national office to the east coast.

*　　　*　　　*

I have enjoyed more than 11 years of service with the organization and feel very positive about the many contributions I have made during that period of time.

IN VINO VERITAS!

Marian

(Exh. I, at 1.) For many of the sixty-five Commanderie Members, including specifically the forty presidents of local Commanderie chapters, Baumann's June 28 e-mail was the first they had ever heard about any planned relocation of the national office to the East Coast.

### H.    Lord Has Baumann Terminated

47.    Two days later, on June 29, 2007, Lord had Baumann terminated.

48.    Specifically, Baumann arrived at the national office on the morning of June 29. In reviewing her e-mail inbox, she encountered a confusing e-mail sent to her by Sutton that day, which mentioned that a paralegal from Commanderie's outside law firm would be coming to the office two days before, on June 27. Baumann promptly called Sutton and asked him to explain his June 29 e-mail. Sutton admitted that he had made an error in typing with respect to the dates, and confirmed that the paralegal would be stopping by that day. Sutton further stated that the paralegal would ask Baumann some questions, and then would ask Baumann to leave the national office

49.    The paralegal arrived shortly after the end of Baumann's telephone conversation with Sutton. At approximately 1:00 p.m., after more than a decade of lauded service to the Commanderie, Baumann was unceremoniously escorted out of Commanderie's national office by a paralegal who worked for Commanderie's outside legal counsel.

50.     Lord, accompanied by his wife, arrived at Commanderie's national office on July 2, 2007. Lord loaded the assets, documents and files of Commanderie into a rented trailer truck. As subsequently admitted by Lord, he took what he described as the "detritus" of the national office to his New Jersey residence, where it "live[s] (temporarily) in the den of a New Jersey Jaguar." (Exh. A, at 4.)

**I.      Lord Lies to the Members in His July 19 Memorandum, Telling Them Baumann Had Resigned When, in Fact, Baumann Had Been Fired – By Lord**

51.     The Members of Commanderie had already expressed their displeasure regarding Lord's plan to move Commanderie's national office to an undetermined place on the East Coast. Moreover, the Commanderie Members were displeased that the entire affair had been executed by Lord without first seeking their consideration or consent. Now, Lord had fired Baumann, Commanderie's only employee with whom many Members had favorable dealings over the past eleven years and who had been saluted by the Members with their singing of the Ban Bourgogne less than eight weeks before.

52.     For many of Commanderie's Members, who only first learned of Lord's East-Coast relocation plan on June 27, from Baumann's e-mail, the change in the location of the national office and the termination of Baumann were inextricably linked. Indeed, they were: by disposing of Baumann, Commanderie's only employee, Lord removed the crucial link between Commanderie's national office and Illinois, thereby negating a significant argument against transferring the national office to somewhere on the East Coast.

53.     Confronted with Member dissension, Lord attempted to control the damage wrought by his unilateral actions. To this end, on July 19, 2007, Lord sent his July 19 Memorandum to all of the recipients of Baumann's June 27 e-mail.

54.     From the very beginning, Lord tried to spin the unpopular termination of Baumann, with Lord characterizing Baumann's June 27 correspondence in the recipients' block

of his July 19 Memorandum as a "resignation e-mail," and subsequently averring that, "[i]n plain language, she resigned." (Exh. A, at 1.)

55.    Lord continued to misrepresent the facts surrounding Baumann's termination. Incredibly, Lord falsely claimed that "Baumann decided to issue her unilateral June 27 email to you, and walked out of the office. By any fair construction of the meaning of the word, on June 27[th], Ms. Baumann resigned." (*Id.* at 3.)

56.    Of course, Lord's claims are completely refuted by the fact that Baumann continued to report to work at the Northfield, Illinois national office until June 29. Most telling, Lord never mentioned in his July 19 Memorandum either Sutton's June 29 telephone conversation with Baumann or the paralegal's escorting of Baumann out of the national office only hours later.

57.    Lord then denied ever having desired to move the national office from Northfield, Illinois. (*See id.*) In doing so, Lord admitted that he knew any such move would have been opposed by the Commanderie Members: "[E]ven on the face of it, exactly the same considerations that led [Commanderie] to leave New York and to re-domicile in Delaware two years ago would have made serious consideration of a removal to New York extremely problematical." (*Id.*) Specifically, Lord offered the following contrived reasoning in an attempt to justify the debacle he had created, always careful to blame Baumann while trying not to contradict his earlier misrepresentation to the Members that Baumann had resigned:

> In mid-June it came to our attention that Ms. Baumann had been contacting some of our members and protesting that, from the outset or [sic] our administration or before, Gene Glaser, Dick Sutton and I had concocted an unannounced plan to move the National Office to New York, and to force her out. This is flatly and absolutely untrue. At the Grand Conseil, all three of us had assumed that the National Office would remain in Chicago with Ms. Baumann operating it. To that end, Ms. Baumann received extensive training on the QuickBooks accounting software. (And, as an aside, even on the face of it, exactly the same considerations

that led [Commanderie] to leave New York and to re-domicile in
Delaware two years ago would have made serious consideration of
a removal to New York extremely problematical.)

(*Id.* at 3)

58.    Later in his July 19 Memorandum, Lord admitted to the Members that, prior to

May 8, 2007, "three days after the Toronto Grand Conseil, [he] "had enjoyed [with Baumann] a

pleasant and congenial workplace friendship spanning more than ten years, during which time

[he] had interacted with her as GS of Haddonfield, as Grand Ecuyer, as DG, and finally, as

Grand Connétable.  The very last problem [he] expected to have after the Toronto Grand Conseil

was one with her." (*Id.*)

**J.    Lord Defames Baumann as Part of His Cover-up**

59.    Lord knew that merely lying about Baumann's "resignation" would not put out

the political firestorm he had ignited through his secret effort to relocate Commanderie's national

office.  Lord recognized that, in light of Baumann's well-respected reputation with the Members

earned over eleven years of hard work – which he himself had publicly acknowledged at the

Annual Members Meeting less than eight weeks before – he needed to make it sound like

Baumann deserved to be fired for sinister reasons previously unknown to the Members and even

himself.

60.    Specifically, Lord defamed Baumann in his July 19 Memorandum by telling the

Members that he had discovered that Baumann had engaged in incompetent, if not criminal,

conduct in the performance of her duties at Commanderie:

> On July 2nd my wife Sheila and I went to Northfield, IL, loaded up
> the contents of the office and trucked them to our garage in
> Delanco, New Jersey.  Gene Glaser and I have now reviewed
> some, but not all, of the documents in the National Office files.
> Some things are disturbing.  Very little remains to document the
> activities of the last year.

> *Ms. Baumann erased all the e-mails from our server*, so we have no history of correspondence between the National Office and the sous commanderies, including "year end reports, etc." Without these records, it will be hard to know what you wanted from the National Office in the past, and exactly when you wanted it.

(*Id.* at 4) (emphasis added). Immediately following this passage quoted above, Lord further implicated Baumann with respect to "[r]ecent version of the National data base," which Lord alleged "seem to be missing." (*Id.*)

61.    Thus, by the statement quoted above, Lord clearly and unambiguously accused Baumann of having deliberately destroyed Commanderie documents by erasing Commanderie e-mails from the server. Indeed, Lord's allegation that Baumann "erased all the e-mails from our server," if true – which it is not – would constitute the commission of a criminal act under the federal Computer Fraud and Abuse Act and the Illinois Computer Crime Prevention Law.

62.    At the very least, by this same statement, Lord imputed to Baumann a lack of ability to perform the duties of her employment and a lack of ability in her trade.

63.    Lord's statement in his July 19 Memorandum that Baumann had "erased all the e-mails from [Commanderie's] server" was and is patently false in every respect. Notably, Commanderie never even had its own "server."

64.    Lord knew that this statement was false. Nevertheless, Lord, to placate the Commanderie Members who were upset about Lord's East-Coast relocation plan and the departure of Baumann, made Baumann the scapegoat by alleging, in clear and unambiguous terms, that Baumann destroyed Commanderie documents.

65.    Even if Lord did not know that this statement was false, Lord made this statement with reckless disregard of the truth. Lord never even bothered to take the most basic investigative step: asking Baumann where Lord could find the allegedly "erased" e-mails.

K.    **Lord's Unjustified Termination and Baseless Defamation of Baumann Was Contrary to the Interests of Commanderie and Its Members**

66.    Lord's destruction of Baumann's career and reputation were contrary to the interests of Commanderie and its Members. Indeed, in a letter dated July 26, 2007, a copy of which is attached hereto as Exhibit J, William Boyd, the Grand Senechal of Commanderie's San Francisco chapter, harshly criticized Lord for his July 19 Memorandum, writing as follows:

> I cannot tell you how embarrassed I am for us an organization to read Charlie Lord's July 19[th] letter. I have no idea what transpired with Marian Baumann. Although I would venture a guess that there would be almost unanimity amongst all the Sous-Commanderies that Marian was incredibly responsive to our needs. However, what I do know is that Charlie's letter was unprofessional, unnecessarily demeaning of another human being and specially inappropriate for the leader of any organization. I am a lawyer and I have handled many employment matters during my career. I have never in all my years seen an employer write such an outrageous communication about a former employee.

> Over the past few years I have watched our national organization basically lose its way. People who have given years of their lives to help have been discarded like yesterday's news. We have managed to insult our Canadian neighbors for no reason. Ultimatums, edicts and even threats have been issued by a small coterie of individuals with total disregard for the rest of their fellow officers. It would appear that precipitous action concerning our national office and our office manager was taken without discussing it with all our national officers. The end result is that the once proud Commanderie … is now operating out of somebody's garage in New Jersey.

(Exh. J, at 1-2.).

L.    **Lord's Plan Completely Backfires … and the Commanderie Members Force Lord to Resign**

67.    Undoubtedly, Boyd was not the only Commanderie Member to disapprove of Lord's heavy-handedness in managing Commanderie's operations, causing the termination of Baumann and attempting to unilaterally move Commanderie's national office. While Lord was vacationing on an African safari, the Executive Committee of Commanderie's Grand Conseil

met in a special meeting. At that special meeting, the Executive Committee decided to demand that Lord tender his resignation. The obvious inference is that the Commanderie Members demanded Lord's resignation because Lord had Baumann terminated.

68.    Lord tendered his resignation through his e-mail dated September 15, 2007, a copy of which is attached hereto as Exhibit K. According to Lord, "[t]he charges against me, apparently, include imperiousness and a lack of appropriate politesse." (Exh. K, at 1.)

69.    After characterizing his resignation as a conviction *in absentia*, Lord concludes: "No matter. As things now stand, nuances of decorousness are quite beside the point. What's done is done, and probably well done, too." (*Id.*) Nowhere in his September 15 communiqué does Lord mention, let alone express regret over, his unfair termination and subsequent defamation of Baumann.

### COUNT I – TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST LORD)

70.    Baumann repeats and realleges paragraphs 1-69 as fully set forth herein.

71.    At all times relevant to this Complaint, Baumann maintained a reasonable expectation of entering into a valid business relationship with Commanderie through her continued employment at-will.

72.    At all times relevant to this Complaint, Lord knew of Baumann's expectation of entering into a valid business relationship with Commanderie through her continued employment at-will.

73.    By having Baumann terminated, Lord purposefully interfered with Baumann's legitimate expectancy and prevented Baumann's legitimate expectancy from ripening into a valid business relationship. Further, such conduct by Lord was unjustified and malicious.

74.    Baumann has been significantly damaged by her termination in an amount which cannot be calculated with exact certainty at this time.

WHEREFORE, plaintiff, MARIAN BAUMANN, prays that this Court:

(a)    award damages in excess of $50,000, as this Court deems appropriate under the circumstances;

(b)    award punitive damages in such an amount as this Court deems appropriate under the circumstances; and

(c)    award such further relief as this Court deems appropriate under the circumstances.

Respectfully submitted,

One of the attorneys for Plaintiff,
MARIAN BAUMANN

#90080
William Lynch Schaller
John M. Murphy
Peter P. Tomczak
Kevin M. Glynn
Baker & McKenzie LLP
Suite 3500
130 East Randolph Drive
Chicago, IL 60601-6384
312/861-8000

CHIDMS1/2571242.2

1910 - No Fee Paid
1919 - Fee Paid
Jury Demand                    CCG N067-10M-6/09/04 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Marian Baumann

v.                                              No. _____

Charles Lord

2007L012482
CALENDAR/ROOM U
TIME 00:00
Other Com Litigation

NOV -2 PM 4 15
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

### JURY DEMAND

The undersigned demands a jury trial.

_____
(Signature)

Dated: November 2 _____, 2007

Atty. No.: 90080

Name: Baker & McKenzie / Peter P. Tomczak

Atty. for: Plaintiff, Marian Baumann

Address: One Prudential Plaza / 130 E. Randolph Dr.

City/State/Zip: Chicago, IL  60601

Telephone: (312) 861-8000

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

EXHIBIT A

FROM: Charlie Lord, GPG, Commanderie d'Amérique

TO: All recipients of Marian Baumann's June 27th resignation email,
closing the Tastevin National Office

RE: <u>What Happened And Plans Going Forward</u>

July 19, 2007

  This email is addressed to all members who were sent an email on June 27, 2007 from the Commanderie d'Amérique's former employee, Marian M. Baumann, announcing that she would absent herself from the office at 2 Northfield Plaza in Northfield, Illinois from June 27th onward, and that, from then forward, Grand Connétable Dick Sutton and I should be contacted about all Tastevin business. Ms. Baumann sent this email without prior consultation with, or notice to, d'Amérique or the current National Officers. In plain language, she resigned.

  Two questions probably occurred to every recipient of the email. How did this situation come about? How will the National Office function going forward?

  I would have liked to have answered those two questions immediately, but the advice of counsel was that I should remain silent until all matters relating to Ms. Baumann's employment with d'Amérique had been fully and finally concluded. What should have been a straightforward task taking days took the better part of a month, and ultimately, while we tried to reach an amicable severance agreement with Ms. Baumann, that has proved impossible. As of 5 PM PDT this evening, July 19th, 2007, we have withdrawn a written, signed agreement that was delivered to Ms. Baumann's counsel in Chicago one week ago on July 12th.

  As you will read below, on or about June 15th, Dick Sutton contacted Ms Baumann to tell her that the assertions she had made and was making to various members were simply untrue. Ms. Baumann was alleging that there had been "a plan from the beginning" by me, by Dick Sutton and by Gene Glaser to close the Chicago office and to move the National Office to New York. In answer to Dick's denials, Ms. Baumann simply insisted that she "knew better." And then she told Dick that she would not, in the future, work with him, with Gene, or with me. She demanded to be paid $25,000 severance.

  Following Ms. Baumann's conversation with Dick Sutton, he related the details to Gene Glaser and to me. As the three principal operating officers of d'Amérique, we agreed that "best practices" management had become impossible. Therefore, we agreed that it was in the best interests of the organization that we should accede to Ms. Baumann's demand for a monetary settlement as part of an agreement that would hold both parties harmless from future disputes and that would end the situation cleanly and quickly. At the time of Dick's June 15th conversation with her, Ms. Baumann was already represented by counsel, so Grand Jurisconsulte David Arata entered into discussions about agreement language with her lawyer. The size of the severance payment was never in dispute.

  Early last week (on or about July 9th), Dave Arata conferred with Ms. Baumann's lawyer. The lawyer told Dave that he believed the agreement language had been perfected to the point that it could be given to Ms. Baumann for her signature. The agreement documents, duly signed by Dave and by me, arrived in Ms. Baumann's lawyer's office on July 12. As worked out in earlier discussions, the agreement specified that a severance payment of $25,000 (less federal and state withholding taxes) would be made to Ms. Baumann in two equal lump sums. The first would be delivered to Ms. Baumann's lawyer as soon as practicable (within a few days) after the signing of the agreement. The second and final payment would be delivered after the

d'Amérique property that Ms. Baumann had earlier affirmed she had in her possession had been delivered to a paralegal to be hired by d'Amérique for the purpose of receiving it.

Two days ago, on Tuesday, July 17th, Dave Arata was informed by Ms. Baumann's attorney that she now demanded the full $25,000 without any deduction for taxes, and that she now demanded that the agreement should be rewritten to recast what was, in fact, a "severance payment" as a "settlement for unspecified claims" in order that no federal or state taxes would have to be deducted.

From the start of the negotiations, our counsel had advised us that any payment to Ms. Baumann in these circumstances must be considered as "severance" under our tax laws. We were advised that we were legally required to make state and federal deductions. From our perspective, Ms. Baumann's demands that we rename the payment a "settlement for unspecified damages" would have required us to characterize our severance payment in a way that would be contrary to the facts and contrary to the way we had been advised that the Internal Revenue Service would rule in an audit. Equally important, calling her severance payment a ""settlement for unspecified damages" would have required d'Amérique to embrace a claim of culpability that was contrary to the fact that Ms. Baumann had no *bone fide* claim against d'Amérique.

The truth of the mater was that, in recognition of Ms. Baumann's past service, d'Amérique's negotiators had gone to extraordinary lengths to be so fair and generous in the face of overt provocation. But we simply were not prepared to agree to misrepresent the facts. Ms. Baumann declined to accept this, and so any hope of an agreement is now irrevocably dead.

How did this unfortunate situation come about?

On May 8th, three days after the end of the Toronto Grand Conseil, I phoned Ms. Baumann about the status of matters in the National Office. In order to help me "read in" to my new duties as GPG, I asked her to let me know in a short memo, either at the beginning of each week looking forward, or at the end of each week looking back, what things were going to be done in the coming week, or what things had been accomplished in the week just past, as well as what immediate challenges still faced us.

Ms. Baumann's response was that she "didn't have time spend writing memos like that," and besides, the operation of the National Office was of "no concern" to the GPG. Ms. Baumann claimed that, "according to the Red Book," it was the Grand Connétable, not the GPG, who oversaw the National Office. (For the preceding three years I had been Grand Connétable. I had never been given responsibility for managing the National Office, nor had Ms. Baumann found occasion to mention this putative responsibility to me.). In any event, as I explained to Ms. Baumann, there is nothing in our charter or in the bylaws that relieves me, as the chief executive officer, of the responsibility for the overall administration of d'Amérique, including, of course, the National Office.

But Ms. Baumann continued to resist requests for information that I made to her, and ignored or refused to implement suggestions that I made. Illustrative of our relationship is what happened when Ms Bauman told me that she needed a new computer. Ms. Baumann sent me an email with a recommendation from a "computer expert" for a computer. He worked in a company owned by of one of our members, but because his recommendations did not include any brand names, any vendor information, or any mention of included software, I requested to be put in touch with him in order to assure myself that we would be purchasing hardware and software that would perform functions which I believed we would need going forward. Despite my verbal and written requests to set up a phone conversation with the expert, Ms. Baumann refused.

In mid-June it came to our attention that Ms. Baumann had been contacting some of our members and protesting that, from the outset or our administration, or before, Gene Glaser, Dick Sutton and I had concocted an unannounced plan to move the National Office to New York, and to force her out. This is flatly and absolutely untrue. At the Grand Conseil, all three of us had assumed that the National Office would remain in Chicago with Ms. Baumann operating it. To that end, Ms. Baumann received extensive training on the QuickBooks accounting software. (And, as an aside, even on the face of it, exactly the same considerations that led d'Amérique to leave New York and to re-domicile in Delaware two years ago would have made serious consideration of a removal to New York extremely problematical.)

On June 15th Dick Sutton, who from the end of the Grand Conseil until mid-June had had virtually no contact with Marian, called her to say that she was simply wrong in thinking that it "had always been our plan" to depart Chicago. Ms. Baumann stated that she "knew better"; that she was consulting a lawyer; that she wanted $25,000 in separation; and that she would not work with me or Dick or Gene even in transition to a new employee. By this point in mid-June, and probably well before mid-June, the National Office (as staffed) had essentially ceased to serve its purpose.

Illinois is an "at will" employment state, meaning that someone without a definitive contract can be terminated for no reason. But the legal right to do something does not preclude someone filing suit. Gene, Dick and I decided that it was in the best interests of d'Amérique to conclude with finality Ms. Baumann's employment as soon as practicable, and to render moot any issues between us. To that end, and given that Ms. Baumann had served d'Amérique for eleven years, and that many members, including ourselves, had thought well of her, we concluded to accept her demand for $25,000, obtain control of our office records and related information, and execute a full and final release. (Ms. Baumann's salary was $58,000, up from $23,000 when hired, plus gasoline, plus a term life insurance policy).

Accordingly, we asked Dave Arata to work with Ms. Baumann's lawyer on a severance agreement. While work on agreement language was progressing, Ms. Baumann decided to issue her unilateral June 27 email to you, and walked out of the office. By any fair construction of the meaning of the word, on June 27th, Ms. Baumann resigned.

In summary, that is how we got there.

Permit me, please, a personal note. Until May 8, three days after the Toronto Grand Conseil, I had believed that Ms. Baumann and I had enjoyed a pleasant and congenial workplace friendship spanning more than ten years, during which time I had interacted with her as GS of Haddonfield, as Grand Ecuyer, as DG, and finally, as Grand Connétable. The very last problem I expected to have after the Toronto Grand Conseil was one with her.

Let us now turn now to the second question you probably have. How will the National Office function going forward?

First, of course, everyone must understand that this will be "a work in progress." Here's where we are as of this minute.

With the help of a paralegal in Chicago, we were able to obtain Ms. Baumann's keys, have her destroy her d'Amérique credit cards and obtain some, but not all, of our records and office information. (Our lease in Chicago runs through October 31st, and we are obligated to pay rent until that time or until the landlord finds a new tenant.)

On July 2nd my wife Sheila and I went to Northfield, IL, loaded up the contents of the office and trucked them to our garage in Delanco, New Jersey. Gene Glaser and I have now reviewed some, but not all, of the documents in the National Office files. Some things are disturbing. Very little remains to document the activities of the last year.

Ms. Baumann erased all the emails from our server, so we have no history of correspondence between the Nationals Office and the sous commanderies, including "year end reports, etc." Without these records, it will be hard to know what you wanted from the National Office in the past, and exactly when you wanted it.

Recent versions of the National data base seem to be missing. Or, the files are not up to date. It is hard, at this point, to tell which. With what we do have of the data base files, it will be possible, with work, to recover most of our data. We will depend on you to help us fill in the blanks. Aside from the data base, almost all other recent files have been deleted from the National Computer.

On the plus side, we do, have our financial records from October 1, 2006 onward on our new QuickBooks system, backed up with parallel records still being kept by our accounting firm in St. Louis.

We expect that within a month to six weeks we will have a new National Office, somewhere in Delaware, Pennsylvania or New Jersey, depending on where we find the best candidate to staff the office. We are looking for somebody with good computer skills. Our goal in the transition period will be to continue to serve your needs as close to normal as possible. Of course you will be advised and provided with the National Office's new address, telephone and email as soon as we have them.

Going forward, if you have questions about procedures or protocol, first try your DG, then Chef du Protocol Jim Davies, then Dick Sutton, and then call me.

Other details of interest are:

It was not possible to maintain AT&T Global as our ISP. That service has been cancelled and the old Tastevin email address no longer works. At present, the best bet is to email me, Dick Sutton, or Gene Glaser. (Charlie Lord, charles_lord@hotmail.com, Dick Sutton, kloof.1@comcast.net (NOTE: Dicks address is new.), Gene Glaser, rozgene@nyc.rr.com).

The National Office telephone number (847-784-0408) still works (through the miracle of Remote Call Forwarding). Therefore, if you call the old Office number, even though there is not telephone in Chicago, the call will be shunted to a telephone in New Jersey. The machine on that number has four "mailboxes": 1, National Office; 2, Charlie Lord; 3, Dick Sutton; 4, Gene Glaser. It will save Tastesvin nine cents a minute if you simply call the New Jersey number directly (856-764-8348), but if you can't remember that, call the old number.

Currently, all mail for the National Office should be sent to Charles N. Lord, GPG, 101 Delview Lane, Delanco, NJ 08075. Any mail sent to the old National Office address will be forwarded once a week from Northfield, Illinois to New Jersey. Obviously, this will take longer than sending things directly to New Jersey.

Changes or additions to the National Calendar should be provided to me, including the schedule of any sous commanderie planning to visit France.

Finally, I know that many of you are worried that you'll never get another menu cover from the National Office or another pack of place cards. Not so. At Philadelphia International Airport two weeks ago, I picked up from France a shipment of 6,000 menu covers, 7,000 place cards, 145 cups and ribbons, etc. In other words, we now have on hand what should be a full year's supply of these "consumables." Like the other detritus from the National Office, these also live (temporarily) in the former den of a New Jersey Jaguar. In my new role as "national stenographer pro tem," I am able to meet your needs for those items and even, with sufficient notice, arrange for the purchase of ceremonial robes.

Those of you who are Grand Sénéchaux will be receiving another message from me next week asking that you get your order together for menu covers, place cards, etc. for the coming membership year. Please do so in a timely manner, since there is a "pack and send" learning curve to master, too. But I have already established a new UPS account, and we're pretty much ready to go.

I have created and will send you a PDF in color showing the new menu cover choices, and also including some "historic" covers that lurked, forgotten, in the Northfield National Office. Until now. They are quite wonderful.

I will be glad to answer any other questions you may have about Marian's departure, etc. Give me call. Over the next couple of months we'll need your cooperation and help as we try to get things up to speed. But, with your help and understanding, it won't be long until I actually believe you'll agree that there has been some improvement over the way things were done in the past. If you don't agree, please let me know.

In Vino Veritas,

*Charlie*

Charles N. Lord, GPG

# EXHIBIT B



# Confrérie des Chevaliers du Tastevin

## Commanderie d'Amérique

101 Delview Lane, Delanco, NJ 08075
(856) 764 9287  Fax (856) 764 3730
Charles_Lord@Hotmail.com

Charles N. Lord
Grand Pilier Général

May 21, 2007

Dear Marian,

I am not quite sure what changed in our relationship between 4:30 PM Saturday afternoon when we carried Dick Finlay's "Escargot de Nuits" and Barry Cooper's Steuben bowl down to the ballroom so they would be in place for the presentation at the Toronto Grand Conseil ball, and three days later. On Saturday evening, everything seemed fine between us, and it seemed that a protracted, difficult period for many of us soon would end. But by the morning of Tuesday, May 8th, apparently something material had changed for you. Your May 17th email reinforces that notion. Whatever it was or is, I think we'd better get busy and straighten it out for the sake of what I believe has been a decade long friendship between us, based, I thought, on mutual respect; for the sake of our business relationship; and for the good of the Commanderie d'Amérique.

Because my predecessor had shown no inclination to prepare me for my administrative duties as GPG, or to familiarize me with day to day procedural routines, I had hoped you would become, in essence, my tutor about the way in which business had been conducted over your eleven years with the organization. Better than anyone else in d'Amérique, Marian, you are in a position to provide me the on the job-training that is absolutely essential if I am to faithfully and diligently discharge my duties as Chief Executive Officer.

Were your office in the next cubicle or a few steps down the hall, I would have asked you into my office and offered you a cup of coffee so we could discuss such matters, or I would have knocked on your door and sat in font of your desk while we talked. But your desk is 800 miles away. That geographical remove makes it somewhat harder to form a close working relationship, but not impossible… so long as there is goodwill on the part of both parties. Permit me to observe that, for any number of reasons, I know we would all much prefer to leave the National Office just where it is and just as it is.

If I have to, I'll go to Chicago and sit in front of your desk to discuss our relationship before I go to France at the end of this month. Marian, I really do want to get this thing back on track.

With folks like Sutton, Glaser, and Leonardini on board, we've now got what I believe to be a dream team. I've always assumed that you would be a key player. Let's be friends as well as colleagues. And let's start today.

Charlie

# EXHIBIT C

**Main Identity**

| | |
|---|---|
| **From:** | "Charles Lord" <charles_lord@hotmail.com> |
| **To:** | <tastevin1@sbcglobal.net>; <kloof@adelphia.net>; <rozgene@nyc.rr.com> |
| **Cc:** | <charles_lord@hotmail.com> |
| **Sent:** | Thursday, May 24, 2007 11:50 AM |
| **Subject:** | Charlie Lord responds t Marian's RE: Attached G.C. Attendance |

Dear Marian,

Super helpful! Many thanks. I know I'm going to feel very stupid when I get your answer, but what does "MMB Attendance          1 " mean?

Ah, so!!! Figured it out all by myself!

Many thanks, MMB!

Charlie

PS I talked to Dick Sutton this morning RE: Edward Steves' queston about attendance and Dick said, realistically, 155-170. Your number is bang in the middle. I called Edward and had a nice chat, gave him Dick's number and yours, so now that you and Dick are both lying about essentially the very same number, we can all swear to it with confidence.

Some of the troops are still grumbling, and so Dick is preparing a "look-'em-in-the-eye" white paper on the subject of invitations for the National Officers.

c.

# EXHIBIT D

## Main Identity

| | |
|---|---|
| **From:** | "rozgene" <rozgene@nyc.rr.com> |
| **To:** | "Marian Baumann" <tastevin1@sbcglobal.net> |
| **Sent:** | Thursday, May 24, 2007 2:28 PM |
| **Attach:** | JUNE12-13.doc |
| **Subject:** | My visit June 12-13 |

Dear Marian,

I know I said I sent this to you but apparantly it got lost in cyberspace? Another more likely explanation is that I thought I sent it when I didn't.

In connection with my visit with you on June 12 and 13, I have prepared and attached a list of items I would like to review. Some items might have to come from Bob Brinson, such as a request for the Transaction Detail for all expense accounts from 10/1/05-19/30/06. If so would youi please ask Bob to send it to me if you do not have it. Since you have reconciled the QuickBooks going back to October, 2006 you should be able to provide that info to me directly for the period requested

If possible, I would like that info mailed or emailed to me before my trip, so  that I can review it and discuss any questions I have with you.

Please review the list and let me know if you have any questions.

Beet regards.

Gene

DOCUMENTS AND REQUESTS FOR INFORMATION
MY VISIT JUNE 12-13

PLEASE HAVE THE FOLLOWING DOCUMENTS AVAILABLE FOR ME TO
REVIEW:
ALL INSURANCE POLICIES
ALL CERTIFICATES OF DEPOSIT
CURRENT LEASE ON OUR OFFICE SPACE
ANY CONTRACTS WE HAVE WITH VENDORS OR OTHERS (e.g. SERVICE
    CONTRACTS FOR HARDWARE AND SOFTWARE)
A LIST OF INDIVIDUALS WHO DO WORK FOR US WITHOUT A CONTRACT
    (A LA KELLY AND BRYAN)

**REVIEW OF FINANCIAL RECORDS**
THE TRANSACTION DETAIL FOR EVERY EXPENSE ACCOUNT FROM THE
QUICKBOOKS SYSTEM FROM OCTOBER 1, 2005 THROUGH SEPTEMBER 30,
2006, PLUS FROM OCTOBER 1, 2006 THROUGH MAY 31 ( IF MAY IS NOT YET
AVAILABLE THEN THRU APRIL 30)
A LIST OF ALL JOURNAL ENTRIES MADE SINCE OCTOBER 1, 2006
REVIEW OF CURRENT BANK ACCOUNTS AND THEIR USAGE
THE BANK RECONCILIATION FOR EACH ACCOUNT FOR THE LATEST
MONTH END
HOW VOIDED CHECKS ARE ACCOUNTED FOR
SUPPORT FOR ANY ACCOUNTS RECEIVABLES AND PAYABLES AND OTHER
    BALANCE SHEET ITEMS
DO WE HAVE A LIST OF APPROVED VENDORS
INVOICE SUPPORT: WHO APPROVES AND HOW FILED
PROCEDURES FOR USE OF OUR CREDIT CARD
PROCEDURES FOR POSTAGE ( METER? HOW POSTAGE IS PURCHASED AND
ACCOUNTED FOR)

**BUDGETING**
ANY SUPPORTING INFORMATION YOU HAVE ON THE CURRENT BUDGET
BUDGETING FOR THE FY 10/1/07-9/30/08 MUST BEGIN NOW AND PROGRESS
IN TIME FOR THE OCTOBER OFFICER'S MEETING. MUST BE READY FOR
GPG AND GC REVIEW PRIOR TO THAT

**COMPUTER**
THE COMPUTER FIELD LAYOUT OF THE CURRENT ROSTER
HOW AND WHEN ARE CHANGES TO THE ROSTER MADE

**PERSONNEL**
NELPLEASE ARRANGE FOR ME TO MEET KELLY AND BYRAN AT SOME
TIME DURING MY VISIT

**MISCELLANEOUS**
PLEASE MAKE AN SET OF KEYS TO THE OFFICE AND ANY CABINETS
(DON'T TAKE THIS PERSONALLY, IT GOES WITH MY PHILOSOPHY OF
PROTECTION IN CASE YOU ARE HIT BY A BUS)

# EXHIBIT E

**Main Identity**

| | |
|---|---|
| **From:** | "Charles Lord" <charles_lord@hotmail.com> |
| **To:** | <kloof@adelphia.net>; <rozgene@nyc.rr.com>; <tastevin1@sbcglobal.net> |
| **Cc:** | <charles_Lord@Hotmail.com> |
| **Sent:** | Thursday, May 31, 2007 3:26 PM |
| **Attach:** | 07 E 31CNL Memo on Request for Purchase Authorizations- Word 97-2003 format.doc |
| **Subject:** | Charlie Lord forwards new policy on National Office purchases |

Dewar Dick, Gene, and Marian,

Attached please find a memo detailing a new policy, effective immediately, concerning purchases by the National Office with a value (cumulative purchase price) of $250. or more.

The new policy is designed to give management a better understanding of the purchasing decisions made by the National Office.

Marian, please make sure that a copy of the new policy is filed with other our SOPs such as the "Red Book."

Many thanks and best regards to all,

Charlie

Date:        May 31, 2007
From:        Charles N. Lord, Grand Pilier Général
To:          Richard L. Sutton, Grand Connétable
             Eugene Glaser, Grand Argentier
             Marian M. Baumann, National Office secretary
             File: National Office
Subject:             "Request for Purchase" authorization
Effective date:  ·     Effective immediately

Effective immediately, no single item and/or combination of items for the same general
purpose or project costing or cumulating $250 or more will be contracted for or
purchased by the Commanderie d'Amérique's National Office until and unless the
following conditions have been met:

  1- A "Request for Purchase" memo has been drafted by the National Office
     secretary and circularized to the Grand Pilier Général and has received his
     authorization; or, such a memo has been drafted and submitted to the Grand
     Argentier for his authorization and the Grand Pilier Général has been consulted
     and has concurrently approved of the purchase; or, in the GPG's protracted
     absence or inability to act, the Grand Argentier has approved of the purchase
     and has consulted with and has received concurrent approval from the Grand
     Connétable.
  2- Memos requesting authorization will be circularized to the GPG, the GA, and the
     GC.
  3- At a minimum, a "Request for Purchase" memo for an expenditure of $250 or
     more must:
            a) Cleary state the purpose of the expenditure
            b) Clearly state how and where the money is to be spent
            c) Clearly identify the vendor(s) or supplier(s) of the goods and
               services
            d) Identify alternative suppliers or providers
            e) Demonstrate that the best price / a competitive price has been
               obtained for the service or goods to be purchased
            f) If the service or goods is (are) to be purchased other than from the
               low cost supplier, explain why a higher cost provider / supplier has
               been chosen
  4- After the goods / services have been purchased, the National Office will notify
     the GPG, GA, and CG that the purchase has been made; will give the actual
     dollar amount expended; and will explain any variation from the "Request for
     Purchase" authorization as it was originally submitted.

Further, it is anticipated that in the next few weeks the Grand Argentier will establish
either a two signature policy for checks written by the National Office secretary, and/or
will establish a ceiling dollar amount for single signature checks written by the National
Office secretary.

Signed,

*Charles N. Lord*

# EXHIBIT F

**Main Identity**

From:    "marian baumann" <tastevin1@sbcglobal.net>
To:       "louis-marc Chevignard" <Chevignard@blackberry.orange.fr>
Sent:    Monday, June 11, 2007 10:14 AM

Louis-Marc,

I have just received confirmation that Charlie Lord, Dick Sutton and Gene Glaser are planning to move the national office to the East Coast.

Charlie has been planning this for some months, I have learned.  I anticipate that I will be resigning on June 15, Friday of this week.

Marian

6/18/2007

# EXHIBIT G

## Main Identity

**From:** <Vougeot21@aol.com>
**To:** <tastevin1@sbcglobal.net>
**Sent:** Monday, June 11, 2007 3:45 PM
**Subject:** move

Marian,
I am discovering this and this is unexpected to me.
Is it the end of everything?
I understand your position but I am really sad to see you leave like this. Are you sure you should anticipate that fast?
Then, things are getting really bad.
I am not very proud of this I would say.
Louis-Marc

# EXHIBIT H

**Main Identity**

| | |
|---|---|
| **From:** | "Charles Lord" <charles_lord@hotmail.com> |
| **To:** | <ingrid.lagrange-dupin@closdevougeot.info> |
| **Cc:** | <kloof@adelphia.net>; <charles_lord@hotmail.com>; <tastevin1@sbcglobal.net> |
| **Sent:** | Tuesday, June 19, 2007 2:17 PM |
| **Subject:** | Charles Lord to Ingrid LAGRANGE DUPIN Re: Supply order for 2008 season |

Ingrid LAGRANGE DUPIN

Dear Mme. Dupin,

Marian Baumann has forwarded your email correspondence to me. It is true that we will be moving the National Office to the east coast sometime this summer. Exactly where the office will be located has not yet been determined.

**The very best plan would be to have you ship the materials to arrive at my house in New Jersey either before 15 August OR as close to 15 September as possible.**

My address is:

Charles N. Lord,

GPG, Commanderie d'Amerique

101 Delview Lane,

Delanco, NJ 08075 USA

(856) 764 9287

Charles_Lord@Hotmail.com

I will be in Africa from 20 August through 10 September, but will be home on 15 September. I am not sure when you plan to dispatch your shipment to the United States or how long it usually takes in transit, but if we have an office address before you ship, I would like to have you ship to the ofice address.

Please let me know when you plan to ship, and let me know how long shipments take in transit.

Many thanks for your help during this transition.

If you have any questions, please email me.

Sincerely,

Charlie

Charles N. Lord, GPG, Commanderie d'Amerique

EXHIBIT I

**From:** marian baumann [mailto:tastevin1@sbcglobal.net]
**Sent:** Wednesday, June 27, 2007 11:02 AM
**To:** will zeckendorf; robert forward; christian brown; robert singewald; jim kelley; jack lewis; charles haislet; joe sweeney; carl eklund; tom amonette; jonathan turner; Arnie Poltenson; jim swinden; William Donovan; Charles Lord; chip brennan; chris steffen; David Arata; bill donovan; carlos arango; fred frye; marcel elefant; Weissman, George; George Weissman; Yadley, Gregory C.; kevin hill; hillgeop@verizon.net; harold block; jack powell; james cosmides; Nielsen, Jeff; jeff nielsen; john olson; deborah martin; dick sutton; leslie elen; linton whitaker; michael eppig; michael walsh; judy odell; philip whitacre; joe Stein; tom quattlebaum; Reed Day; Rives Neblett; jim davies; Robert Hull; ron goldneson; gene glaser; stephen jacobs; Sheldon Stock; stefan davis; Amonett,Tom; Tom Leonardini; david yewell; mark cook; bob linn; john k silver; dick finlay
**Cc:** tom roboz; bill randall; allan bulley; john sprague; john maddox; Kelly Shannon; Michael Rockefeller; warner henry; Cooper, Barry; don carlson; alastair carruthers; Robin Hunt; bill dick; jim cunning; Jim Pipkin; john bixler; Peter C. Marshall; Drew Karandjeff; gary strauss
**Subject:** National Office Move

Confreres,
Grand Pilier General Charles Lord and Grand Connetable Richard Sutton have determined that it is in the best interest of the organization to relocate the national office to the east coast.

The national office in Northfield, Il., will close soon.  Please direct all inquiries and requests to:
   Charles Lord: charles_lord@hotmail.com or 856/764-9287
                    or
   Richard Sutton: kloof@adelphia.net or 302/655-7951

I can be reached at my home address:
         Marian M. Baumann
         816 Westwood Lane
         Wilmette, Il 60091
         847/920-9285
         baumsix@aol.com

I have enjoyed more than 11 years of service with the organization and feel very positive about the many contributions I have made during that period of time.

IN VINO VERITAS!


Marian

EXHIBIT J

July 26, 2007

From: Bill Boyd, Grand Senechal San Francisco

To:    All recipients of Charlie Lord's
       July 19, 2007 communication

Re:    National Tastevin Issues

     I have thought about this for some time now and I feel obligated to say something about what has apparently been going on. I have been active in the Confrerie for over 15 years. I previously served as the Connetable and since 2002 I have been the Grand Senechal of the Sous-Commanderie de San Francisco. I have been fortunate enough to get to know many of you over the years. The Tastevin has been wonderful to me and I have loved being part of it. Unfortunately, and with great sadness, I see our organization in the process of self-destructing.

     The camanderie and chivalry that made the Commanderie d' Amerique at a national level so special is dying. We are supposed to be a volunteer organization made up of gentlemen and ladies whose goal is to further the special traditions of Burgundy. We are very selective as to who we bring in as members, and rightfully so. Former Presidents, ambassadors, justices of the United States Supreme Court, mayors and many other distinguished citizens have made us a group to which people aspire to belong.

     I cannot tell you how embarrassed I am for us as an organization to read Charlie Lord's July 19th letter. I have no idea what transpired with Marian Baumann. Although I would venture a guess that there would be almost unanimity amongst all the Sous-Commanderies that Marian was incredibly responsive to our needs. However, what I do know is that Charlie's letter was unprofessional, unnecessarily demeaning of another human being and specially inappropriate for the leader of any organization. I am a lawyer and I have handled many employment matters during my career. I have never in all my years seen an employer write such an outrageous communication about a former employee.

     Over the past few years I have watched our national organization basically lose its way. People who have given years of their lives to help have been discarded like yesterday's news. We have managed to insult our Canadian neighbors for no reason. Ultimatums, edicts and even threats have been issued by a small coterie of individuals with total disregard for the rest of their fellow officers. It would appear that precipitous action concerning our national office and our office manager was taken without

discussing it with all our national officers.   The end result is that the once proud Commanderie d' Amerique is now operating out of somebody's garage in New Jersey.

I think we all need to have a very serious conversation about what is going on and what we can do to change it.   These problems are incredibly embarrassing and could potentially expose us to serious legal liability, which could jeopardize our whole organization.   I really feel that something needs to be done before it is too late and even more damage is done.

Please feel free to contact me by email or by telephone at (818)985-9800 or (415)254-5013, if you have any thoughts about the situation or would like to discuss this further.

# EXHIBIT K

From: Charles Lord <charles_lord@hotmail.com>
Date: Sat, 15 Sep 2007 07:07:55 -0400
To: <alsobrookhb@arlaw.com>, <bgraves@mindspring.com>, <boatner@reilys.com>,
<dhhboyle@aol.com>, <dosenta@aol.com>, <farrar@kinseyinc.com>, <gildred@cox.net>,
<jallred@carolina.rr.com>, <james_pipkin@msn.com>, <jbixler@rossmarshfoster.com>,
<jfcvin@aol.com>, <joek@anbakerco.com>, <paindoc2@juno.com>, <peter@pcmarshall.com>,
<rlessard@flsllc.com>, <wzeckendor@aol.com>
Subject: Charles N. Lord Letter to the Grand Conseil

Date:      September 15, 2007
From:      Charles N. Lord
To:          Members of the Grand Conseil, Commanderie d,Amérique

My Dear Confrères,

Yesterday afternoon, a few hours after Sheila and I returned from a long
planned trip to Africa, I participated in a conference call with two of the
thirteen National Officers who make up the Executive Committee of the
Grand Conseil of the Commanderie d,Amérique. I was informed that this
past Sunday, while we were in Africa, the Executive Committee convened an
extraordinary meeting by teleconference, and that during that
teleconference, the Officers unanimously voted what amounts to a „no
confidence‰ motion on my leadership as GPG. Further, they voted to ask
for my resignation, a resignation that I hereby tender.

The charges against me, apparently, include imperiousness and a lack of
appropriate politesse. I should, of course, have liked to have had the ability
to defend myself and my actions. Because I was eight thousand miles
distant, and was not, in any case, informed that such a meeting was
contemplated, I was found guilty as charged *in absentia*. No matter. As things now
stand, nuances of decorousness are quite beside the point. What,s done is done, and probably well
done, too.

To those of you who have acted as true friends over the years, and
particularly over this past, very difficult year, I offer my most sincere and
abiding thanks. Loyalty and friendship are, I believe, the values on which
the Confrérie was founded. To those of you who have acted otherwise, I
offer my congratulations.

The past four and a half months have been some of the most difficult in my
sixty-seven years. Sheila has suffered the most, which I deeply regret. If I
had the power to change anything at all, that is what I would change.

To those of you who have been so kind as to invite us to attend your
upcoming Chapitres and other functions, this note must serve as my letter
of „regrets,‰ for I know that your invitations were offered to the office and
not to the occupant. Sheila and I will miss being with you.

In yesterday,s conference call the issue of a successor did not come up, but
I expect that Dick Sutton with become Grand Pilier Général, and I hope that
Jack Powell will become Grand Connétable, for he has grown appreciably in

his position as Délégué Général, and Judy is a lovely asset. But whosoever carries on in the top two jobs, I wish them well, and I send sincere best wishes to all of you. As I was fond of saying, „Tastevin is just a Œmarching and chowder, society, but it,s is the best marching and chowder society in the world.‰ And so it can be.

In Vino Veritas,

Charles N. Lord,
Grand Officer


10/3/2007